831 So.2d 93 (2002)
Mitchell WESTERHEIDE, Petitioner,
v.
STATE of Florida, Respondent.
No. SC00-2124.
Supreme Court of Florida.
October 17, 2002.
*96 James B. Gibson, Public Defender, and Nancy Ryan, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Petitioner.
Robert A. Butterworth, Attorney General, and Richard L. Polin, Senior Assistant Attorney General, Miami, Florida, for Respondent.
HARDING, Senior Justice.
We have for review a decision of the Fifth District Court of Appeal on the following *97 questions, which the court certified to be of great public importance:
1) DOES THE JIMMY RYCE ACT VIOLATE THE EX POST FACTO CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
2) DOES THE JIMMY RYCE ACT VIOLATE THE DOUBLE JEOPARDY CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
3) DOES THE JIMMY RYCE ACT VIOLATE THE DUE PROCESS CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
4) DOES THE JIMMY RYCE ACT VIOLATE THE EQUAL PROTECTION CLAUSES OF THE UNITED STATES AND FLORIDA CONSTITUTIONS?
Westerheide v. State, 767 So.2d 637, 659 (Fla. 5th DCA 2000). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const.
This case involves the "Jimmy Ryce Act" (the Ryce Act),[1] which provides for the involuntary commitment of persons who are convicted of sexual offenses and found to be "sexually violent predators." The State instituted involuntary civil commitment proceedings against Mitchell Westerheide, pursuant to the Ryce Act, in January 1999. Prior to the commitment trial, the trial court denied Westerheide's constitutional challenges to the Ryce Act and conducted an adversarial probable cause hearing and a Frye[2] hearing. Westerheide's commitment trial commenced on March 1, 1999. During the trial, the State presented testimony from two expert witnesses who diagnosed Westerheide as being a sexual sadist and having an antisocial personality disorder. The experts based their diagnoses on the facts and circumstances surrounding the underlying offense for which Westerheide was convicted (lewd and lascivious assault on a child and sexual performance by a child),[3] personal interviews with Westerheide, police reports, reports from the Department of Corrections, correspondence between Westerheide and other individuals, videotapes of the sex acts between Westerheide and the victim of the underlying offense, interviews with the victim and Westerheide's father and friends, Westerheide's diary, and tests administered by the experts. Westerheide also called an expert witness who testified that he considers Westerheide to be a sexual sadist, but did not diagnose him as having an antisocial personality disorder. Westerheide's expert further testified that supervision through probation would be sufficient treatment. The jury returned a verdict finding that Westerheide is a sexually violent predator. Pursuant to this verdict, the judge entered a final judgment of commitment for confinement in a secure facility for control, care, and treatment until Westerheide's mental abnormality or personality disorder has changed so that it is safe for him to be at large.
*98 On appeal, the Fifth District Court of Appeal affirmed Westerheide's commitment and upheld the constitutionality of the Ryce Act, but certified four questions relating to the constitutionality of the act as being of great public importance. See Westerheide, 767 So.2d at 659. The district court concluded that involuntary commitment under the Ryce Act is civil, rather than criminal, in nature and that confinement is for treatment and care of the defendant and the protection of the public from the defendant. See id. at 644-46. Accordingly, the district court concluded that the Ryce Act does not violate the ex post facto or double jeopardy clauses of the United States or Florida Constitutions. See id. at 647-48. Further, the district court concluded that the Ryce Act does not violate due process guarantees for failure to provide less restrictive alternatives to confinement in a secure facility. See id. at 648-49. As the district court explained, the Ryce Act requires a jury to find by clear and convincing evidence that the person is a violent sexual predator who has a mental abnormality that predisposes the person to commit sexually violent offenses and that the person is likely to reoffend if not confined in a secure facility. See id. at 648. If the evidence fails to establish this, then the person will not be civilly committed. However, if the jury finds by clear and convincing evidence that the person is a violent sexual predator, it has concluded that there are no less restrictive alternatives that would adequately protect society and provide the necessary control and treatment. See id. at 649. The district court also concluded that the Ryce Act is not void for vagueness as its terms are adequately defined either in the statute itself, by looking at common usage and meaning, or by case law, see id. at 649-53, and that it does not violate the equal protection clauses, see id. at 653-655. Finally, the district court found no error in the jury instructions given by the trial court and no error in admitting the opinion testimony of the State's experts that Westerheide is likely to reoffend. See id. at 655-59, 656-659. The district court certified four questions regarding the constitutionality of the Ryce Act as being of great public importance and requiring resolution by this Court. See id. at 659.
This Court granted review of the district court's decision based on the certified questions and set the case for oral argument. Westerheide raises the four constitutional challenges presented in the certified questions and also raises a question regarding the admissibility of the psychologists' testimony under the Frye test.[4] We address each of the constitutional claims in turn.

Ex Post Facto and Double Jeopardy Claims
Westerheide claims that the Ryce Act violates the constitutional ban on ex post facto laws and the prohibition against double jeopardy. Under both the Florida and United States Constitutions, lawmakers may not enact laws that increase the punishment for a criminal offense after the crime has been committed. See U.S. Const. art. I, § 10 ("No State shall ... pass any ... ex post facto Law ...."); art. I, § 10, Fla. Const. ("No ... ex post facto law ... shall be passed."). Both constitutions also prohibit an individual being punished twice for the same offense. See U.S. Const. amend. V ("[N]or shall any *99 person be subject for the same offence to be twice put in jeopardy of life or limb...."); art. I, § 9, Fla. Const. ("No person shall ... be twice put in jeopardy for the same offense.").
Westerheide contends that the Ryce Act is an ex post facto law in that it increases his punishment for a criminal offense that occurred before the law took effect. He further asserts that the Ryce Act violates the constitutional prohibition against double jeopardy by extending his punishment for his sex offense crime. Because the constitutional prohibitions on ex post facto laws and double jeopardy only apply to criminal legislation and proceedings, we initially address the nature of the Ryce Act.
The Ryce Act, which went into effect on January 1, 1999, is entitled "Involuntary Civil Commitment of Sexually Violent Predators." Under this program, individuals who meet the statutory definition of a sexually violent predator[5] may be involuntarily committed for long-term care and treatment. The Legislature concluded that the existing involuntary commitment procedures under the Baker Act are inadequate to treat "a small but extremely dangerous number of sexually violent predators." § 394.910, Fla. Stat. (2001). The Legislature further recognized that "the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term, and the treatment modalities for this population are very different from [those for individuals who are committed] under the Baker Act." Id.
In Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), the United States Supreme Court addressed similar constitutional challenges to the Kansas involuntary commitment statute for sexually violent predators.[6] The Kansas Supreme Court had invalidated the act on substantive due process grounds. Specifically, the Kansas Supreme Court had concluded that the act's precommitment condition of a "mental abnormality" did not satisfy the due process requirement that involuntary civil commitment be predicated on a finding of "mental illness." Id. at 350, 117 S.Ct. 2072. The Supreme Court granted certiorari on the State's petition and on Hendricks' cross-petition in which he reasserted double jeopardy and ex post facto claims that had not been addressed by the Kansas court. The Supreme Court reversed the judgment of the Kansas court and held that the Kansas statute comports with due process requirements. The Supreme Court further concluded that the Kansas statute did not violate the constitutional proscriptions against ex post facto laws or double jeopardy.
In addressing the constitutional claims raised in Hendricks' cross-petition, the Supreme Court initially considered the nature of the Kansas statutory scheme being challenged, noting that "[t]he categorization of a particular proceeding as civil or criminal `is first of all a question of statutory construction.'" Id. at 361, 117 S.Ct. 2072 (quoting Allen v. Illinois, 478 U.S. 364, 368, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986)). A five-justice majority concluded *100 that the Kansas statute does not establish criminal proceedings and thus confinement under it does not constitute punishment. In reaching this conclusion, the Supreme Court looked at both the stated legislative intent and the intent expressed by the provisions of the act. See id. at 361-69, 106 S.Ct. 2988. The Supreme Court noted the following factors as evidence that the act was not punitive: the State "`disavowed any punitive intent'; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired." Id. at 368-69, 106 S.Ct. 2988. Based on the determination that the statute was not punitive but civil in nature, the Supreme Court concluded that it "neither runs afoul of double jeopardy principles nor constitutes an exercise in impermissible ex post facto lawmaking." Id. at 371, 106 S.Ct. 2988.
Florida's Ryce Act shares many of the hallmarks of the Kansas statute which the Supreme Court found significant in Hendricks. On its face, the Florida statute was clearly intended to create a civil commitment scheme "to address the risk these sexually violent predators pose to society" and to provide "long-term care and treatment" for these individuals. § 394.910, Fla. Stat. (2001). While only individuals convicted of a sexually violent offense[7] are eligible for commitment under the Ryce Act, the previous conviction must be coupled with a current "mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment" in order to meet the statutory definition of a sexually violent predator. § 394.912(10), Fla. Stat. (2001). This belies Westerheide's argument that the State is seeking retribution for a past misdeed; involuntary commitment under the Ryce Act is based upon an individual's current mental state that makes it likely the person will engage in acts of sexual violence. Further, the affirmative restraint of "a small but extremely dangerous number of sexually violent predators" who "pose [a risk] to society" because they are "likely to engage in criminal, sexually violent behavior," § 394.910, Fla. Stat. (2001), is a "classic example of nonpunitive detention." Hendricks, 521 U.S. at 363, 117 S.Ct. 2072.
While "the civil label is not always dispositive," the Legislature's stated intent should only be rejected where the challenging party presents "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" that the proceeding be civil. Allen, 478 U.S. at 369, 106 S.Ct. 2988. The Supreme Court concluded that Hendricks failed to satisfy this heavy burden. See Hendricks, 521 U.S. at 361, 117 S.Ct. 2072. Westerheide, however, contends that the Florida statutory scheme is "more clearly punitive" than the Kansas scheme at issue in Hendricks and cites the following as proof of this more punitive nature: treatment is delayed until after an individual's criminal sentence has been served; there is no effective treatment available for sexually *101 violent offenders; the scheme creates barriers to effective treatment by removing the confidentiality of the patient-psychotherapist relationship and not providing for community aftercare; and the scheme fails to provide for a less restrictive alternative to total confinement in a secure facility. We find these arguments unavailing.
Westerheide claims that Florida has chosen not to provide treatment to mentally disordered sex offenders during their prison sentences, but has instead opted to detain them after their prison sentences in order to begin treatment. He further claims that this delay in treatment does not bear a reasonable and substantial relationship to the stated purpose of the confinement, namely, care and treatment of sexually violent predators. He points to the Legislature's abolition of a special treatment program for mentally disordered sex offenders in prison as evidence of the punitive intent of the Ryce Act at issue here. See ch. 91-225, § 25, Laws of Fla. (repealing chapter 917 entitled "Mentally Disordered Sex Offenders"). However, the majority of the United States Supreme Court apparently found no merit to this "delayed treatment" argument in Hendricks. In his dissenting opinion, Justice Breyer stated that a legislative scheme that delays treatment "until a person is at the end of his jail term (so that further incapacitation is therefore necessary)... begins to look punitive" when viewed against the State's express belief that treatment is possible for such individuals. Hendricks, 521 U.S. at 381, 117 S.Ct. 2072 (Breyer, J., dissenting). Thus, the majority was aware of this similar feature of the Kansas act and was apparently unpersuaded that a delay in treatment rendered the scheme punitive.
Westerheide also asserts that the Ryce Act is "holding the untreatable for treatment" as there is no scientific support that such sex offenders can be helped through treatment. However, as evidenced by the numerous studies cited by both Westerheide and the State in their briefs, the relevant scientific community is in disagreement as to the effectiveness of such treatment. While the Legislature recognized that sexually violent predators are not amenable to treatment under the "existing mental illness treatment modalities," it has also made a determination that "long-term care and treatment of sexually violent predators" is possible. § 394.910, Fla. Stat. (2001). "The Legislature has the final word on declarations on public policy, and the courts are bound to give great weight to legislative determinations of facts. Further, legislative determinations of public purpose and facts are presumed correct and entitled to deference, unless clearly erroneous." University of Miami v. Echarte, 618 So.2d 189, 196 (Fla. 1993) (citations omitted); see also Moore v. Thompson, 126 So.2d 543, 549 (Fla.1960) (stating that courts will abide by legislative findings and declarations of policy unless they are clearly erroneous, arbitrary or wholly unwarranted). In light of the differing opinions of the scientific community regarding the efficacy of treatment for sexually violent predators, the Legislature's determination that these individuals must be civilly committed for long-term treatment and care is not clearly erroneous and is entitled to deference.
Even assuming that no viable treatment is available for sexually violent predators, the Constitution does not prevent the State "from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others." Hendricks, 521 U.S. at 366, 117 S.Ct. 2072. "To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous *102 simply because they could not be successfully treated for their afflictions." Id. The Legislature has determined that these individuals pose a risk to society because there is a high likelihood that they will engage in repeat acts of predatory sexual violence. See § 394.910, Fla. Stat. (2001). "[I]ncapacitation may be a legitimate end of the civil law" and does not necessarily lead to the conclusion that the Ryce Act is punitive. Hendricks, 521 U.S. at 365-66, 117 S.Ct. 2072. Thus, we find no merit to this argument.
Westerheide further argues that Florida's statutory scheme is punitive because it creates barriers to effective treatment. He points specifically to the abrogation of the psychotherapist-patient privilege,[8] the lack of confidentiality during the treatment process,[9] and the failure to provide for community aftercare.
The purpose of the rules of evidence is to promote the ascertainment of truth. The general rule provides that no person in a legal proceeding has a privilege to refuse to be a witness or to disclose any matter, except as otherwise provided in the evidence code, another statute, or the Florida or federal constitutions. See § 90.501, Fla. Stat. (2001). However, in certain circumstances the Legislature judges the protection of an interest or relationship to be sufficiently important to society to justify the sacrifice of facts which might be needed for the administration of justice. See Charles W. Ehrhardt, Florida Evidence § 501.1, at 275 (2001 ed.). The rules of exclusion that have arisen to protect an interest or a relationship are termed "privileges." See Ulrich v. Coast Dental Servs., Inc., 739 So.2d 142, 143 (Fla. 5th DCA 1999). Section 90.503(2), Florida Statutes (2001), provides that confidential communications or records between an individual and a psychotherapist which are made for the purpose of diagnosis or treatment of a patient's mental or emotional condition are privileged. However, there are several exceptions to the psychotherapist-patient privilege listed in the statute, including where the communications are relevant to an issue in proceedings to compel hospitalization of a patient for mental illness under the Baker Act. See § 90.503(4)(a), Fla. Stat. (2001); see also In re Beverly, 342 So.2d 481, 489 (Fla.1977) (recognizing legislative intent to bar the privilege with respect to treating and attending psychiatrists' testimony at an involuntary hospitalization proceeding under the Baker Act). Further, the Legislature has abrogated the privilege for communications between a psychotherapist and patient in other contexts as well. See § 39.204, Fla. Stat. *103 (2001) (waiving privilege for communications between psychotherapist and alleged perpetrator of child abuse or neglect). Thus, the Legislature has made a determination that the privilege should not be recognized in Ryce Act proceedings in order to protect the patient and society. Cf. Martin v. Reinstein, 195 Ariz. 293, 987 P.2d 779, 806 (Ct.App.1999) (upholding abrogation of physician-patient privilege in sexually violent predator commitment proceedings where legislature has "determined that the public good requires that statutory or rule-based confidentiality give way to serve a greater good").
We similarly conclude that the provisions which waive confidentiality during the treatment process do not render the Ryce Act punitive. See §§ 394.9155(7), 394.918(1)-(2) Fla. Stat. (2001). In order to be deemed a sexually violent predator, it must be determined that the individual "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10)(b), Fla. Stat. (2001). Thus, the individual's mental state is at issue during the original commitment proceedings and must be reassessed periodically to ensure that commitment is appropriate under the statute. Consequently, the same policy concerns of protecting the patient and society require that information relating to the patient's mental state be readily available. The nondisclosure of such information could cause harm to the patient who does not receive necessary care and treatment and harm to the public if the patient is at large.
Westerheide also points to the Ryce Act's failure to provide less restrictive alternatives to long-term control, care, and treatment in a secure facility and failure to provide for postcommitment community care as evidence of its punitive intent. However, as the district court noted below, the statutory definition of a sexually violent predator renders less restrictive alternatives inapplicable. See Westerheide, 767 So.2d at 648-49. The statute requires a determination by clear and convincing evidence that the person is a sexually violent predator, that is, the person "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10)(b), Fla. Stat. (2001) (emphasis added). Thus, if the person is amenable to less restrictive alternative treatment he or she does not meet the statutory definition of a sexually violent predator and is not subject to commitment under the Ryce Act.
Further, at the time that the Kansas statute was applied to Hendricks, it "did not require the committing authority to consider the possibility of less restrictive alternatives, such as postrelease supervision, halfway houses, or other methods." Hendricks, 521 U.S. at 387, 117 S.Ct. 2072 (Breyer, J., dissenting). Yet, the majority of the Supreme Court apparently did not consider this failure indicative of a punitive intent as the majority held that "involuntary confinement pursuant to the Act is not punitive." Id. at 369, 117 S.Ct. 2072.
For the reasons stated above, we find no merit to Westerheide's argument that Florida's statutory scheme is more punitive than the Kansas act at issue in Hendricks. Consequently, we conclude that Hendricks forecloses Westerheide's claims that the Ryce Act violates the federal constitutional prohibitions on double jeopardy and ex post facto laws. See id. at 369-71, 117 S.Ct. 2072.
Westerheide also claims that the Ryce Act violates Florida's constitutional protections *104 against double jeopardy and ex post facto laws. However, the Florida clauses are almost identical in wording to that of the federal constitutional provisions. Further, this Court has not construed either state constitutional provision in a manner different from its federal counterpart. See, e.g., State v. Hootman, 709 So.2d 1357, 1358-59 (Fla.1998) (applying same analysis to both state and federal ex post facto claims), abrogated on other grounds by State v. Matute-Chirinos, 713 So.2d 1006 (Fla.1998); Wright v. State 586 So.2d 1024, 1032 (Fla.1991) (same as to double jeopardy claims). See also Traylor v. State, 596 So.2d 957, 962-63 (Fla.1992) ("[W]hen called upon to construe their bills of rights, state courts should focus primarily on factors that inhere in their own unique state experience, such as the express language of the constitutional provision, its formative history, both preexisting and developing state law, evolving customs, traditions and attitudes within the state, the state's own general history, and finally any external influences that may have shaped state law."); Carawan v. State, 515 So.2d 161, 164 (Fla.1987) ("We find that our own double jeopardy clause in article I, section 9, Florida Constitution, which has endured in this state with only minor changes since the constitution of 1845, was intended to mirror this intention of those who framed the double jeopardy clause of the fifth amendment."), superseded on other grounds by § 775.021(4), Fla. Stat. (2001).
Accordingly, we find no merit to Westerheide's double jeopardy and ex post facto claims and answer the first and second certified questions in the negative.

Due Process
The constitutional right of substantive due process protects individual rights from unwarranted encroachment by the government. See Department of Law Enforcement v. Real Property, 588 So.2d 957, 960 (Fla.1991). Substantive due process may implicate, among other things, the definition of an offense, the burden and standard of proof of elements and defenses, the presumption of innocence, vagueness, the conduct of law enforcement officials, the right to a fair trial, and the availability or harshness of remedies. See id. To ascertain whether the encroachment can be justified, courts have considered the propriety of the state's purpose; the nature of the party being subjected to state action; the substance of that individual's right being infringed upon; the nexus between the means chosen by the state and the goal it intended to achieve; whether less restrictive alternatives were available; and whether individuals are ultimately being treated in a fundamentally unfair manner in derogation of their substantive rights. See id.
The state's purposes for the Ryce Act long-term mental health treatment for sexual predators and protection of the public from themare both compelling and proper. As the Supreme Court explained in Hendricks, "[i]t ... cannot be said that the involuntary civil confinement of a limited subclass of dangerous persons is contrary to our understanding of ordered liberty." 521 U.S. at 357, 117 S.Ct. 2072. The parties being subjected to this state action are limited to those who have exhibited "past sexually violent behavior and [have] a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." Id. Although the individual's liberty interest is at stake, that "interest is not absolute" and the "individual's constitutionally protected interest in avoiding physical restraint may be overridden even in the civil context" provided that "the confinement takes place pursuant to proper procedures and evidentiary standards." Id. at 356-57, *105 117 S.Ct. 2072. Confinement under the Ryce Act is limited to those individuals who are likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment. Further, the act provides a range of procedural safeguards to the individuals, including the assistance of counsel and mental health professionals at commitment proceedings,[10] the right to a jury trial,[11] the right to appeal a sexually violent predator determination,[12] at least a yearly mental health examination to determine whether the person's condition has so changed that it is safe for the person to be discharged,[13] the right to petition for release,[14] and in court hearings for the release of a committed person, the state bears the burden of proving by clear and convincing evidence that the person's mental condition requires continued confinement.[15]
Westerheide contends that the Ryce Act violates his right to due process by (1) failing to provide for less restrictive alternatives to total confinement; (2) not adequately defining the statutory terms "mental abnormality" and "likely to engage in acts of sexual violence"; (3) delaying treatment until the defendant completes his prison sentence; (4) requiring the waiver of patient confidentiality during the treatment process; and (5) providing that the standard of proof in commitment proceedings is clear and convincing evidence. Initially, we note that only claims one and two were raised in Westerheide's appeal to the district court below. The State argues that the other due process claims have not been preserved for review by this Court because not raised below. While the constitutional application of a statute to a particular set of facts must be raised at the trial level,[16] a facial challenge to a statute's constitutional validity may be raised for the first time on appeal. See State v. Johnson, 616 So.2d 1, 3 (Fla.1993); Trushin v. State, 425 So.2d 1126 (Fla. 1982). As this Court explained in Trushin, "a conviction for the violation of a facially invalid statute would constitute fundamental error." 425 So.2d at 1129. Further, once an appellate court has jurisdiction it may, if it finds it necessary to do so, consider any item that may affect the case. See id. at 1130. Thus, to the extent that Westerheide's due process claims raise facial challenges to the Ryce Act, we find them appropriate to consider in our review of this matter.
We addressed Westerheide's claims regarding less restrictive alternatives, delayed treatment, and the lack of confidentiality in the context of his double jeopardy and ex post facto claims above. In each instance, we concluded that these characteristics do not render the Ryce Act punitive. We find this reasoning dispositive of Westerheide's due process claims as well and, thus, only address the vagueness and standard of proof claims separately in this section.
Westerheide contends that the Ryce Act should be declared void because the statutory definitions of the terms "mental abnormality" and "likely to engage *106 in acts of sexual violence" are unconstitutionally vague. In order to be committed under the Ryce Act, an individual must meet the two-prong definition of a sexually violent predator. Pursuant to this statutory definition, a sexually violent predator is any person who has been convicted of a sexually violent offense and who suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment. See § 394.912(10), Fla. Stat. (2001). The statute defines "mental abnormality" as "a mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses." Id. § 394.912(5). "Likely to engage in acts of sexual violence" is defined as "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." Id. § 394.912(4). In evaluating Westerheide's due process vagueness challenge, the district court concluded that the term "likely" is a "widely used term that is commonly understood by men and women of common intelligence to mean highly probable or probable and having a better chance of existing or occurring than not." Westerheide, 767 So.2d at 652-53. Other states have rejected similar vagueness challenges to almost identical terminology in their own sexually violent predator civil commitment acts. See Martin v. Reinstein, 195 Ariz. 293, 987 P.2d 779, 803 (Ct.App.1999) (finding term "`likely' is reasonably understood and effectively used in our laws"); Hubbart v. Superior Court, 19 Cal.4th 1138, 81 Cal. Rptr.2d 492, 969 P.2d 584, 596-97, 599-600 (1999) (rejecting vagueness challenges to statutory term "diagnosed mental disorder" and requirement of dangerousness); In re Young, 122 Wash.2d 1, 857 P.2d 989, 1013 (1993) (rejecting claim that terms "mental abnormality" and "likely" are unconstitutionally vague).
As the district court noted below, Florida's statute defines "mental abnormality" in terminology that is consistent with that approved[17] by the Supreme Court in Hendricks.[18] The Supreme Court noted that it has "never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes." Id. at 359, 117 S.Ct. 2072. Civil commitment statutes that limit involuntary confinement "to those who suffer from a volitional impairment rendering them dangerous beyond their control" satisfy substantive due process requirements. Id. at 358, 117 S.Ct. 2072.
We conclude that the Ryce Act satisfies the constitutional due process requirements expressed by the Supreme Court in Hendricks. "The statute ... requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." Hendricks, 521 U.S. at 357-58, 117 S.Ct. 2072. Thus, we find no merit to Westerheide's vagueness challenge.
*107 In conjunction with his challenge to the statutory terminology, Westerheide argues that the instructions given to the jury constituted fundamental error[19] because the instructions omitted the narrowing construction announced by the United States Supreme Court in Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).
After the United States Supreme Court's decision in Hendricks, upholding the Kansas Sexually Violent Predator Act against constitutional challenge, the Kansas Supreme Court held that a commitment under the Act required a finding that the person subject to commitment is completely unable to control his behavior. The State of Kansas sought review of that decision by the United States Supreme Court and argued that the Constitution permits such commitment without any lack-of-control determination. In Crane, the United States Supreme Court held that total or complete lack of volitional control was not required, but neither could an individual be committed without any determination of a lack of control. Instead, the Court ruled that there must be proof that the person has "serious difficulty in controlling behavior." Id. at 870, 122 S.Ct. 867. This proof, when viewed in light of such features of the case as the nature of the psychiatric diagnosis and the severity of the mental abnormality, "must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.
Contrary to Westerheide's arguments, we do not find that Crane requires a specific jury instruction, but rather that there must be proof of "serious difficulty in controlling behavior" in order to civilly commit an individual as a sexually violent predator. A California appellate court recently addressed a similar claim of instructional error based on the decision in Crane. See People v. Hayes, No. AO93285 2002 WL 462277 (Cal.Ct.App. Mar. 26, 2002). Hayes challenged his civil commitment as a sexually violent predator (SVP), arguing that the jury was not properly instructed on the definition of an SVP. The jury was instructed with a verbatim repetition of the definition from the California statute, namely, that an SVP is a person who has been convicted of a sexually violent offense for which he went to state prison and who has a diagnosed mental disorder that makes him a danger *108 to the health and safety of others in that he is likely to engage in sexually violent behavior again. The jury was also instructed from the statute that a diagnosed mental disorder includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others. See id. at *3. Hayes asked for two special instructions which the trial court refused to give, including that the diagnosed mental disorder must render the person completely unable to control his dangerous behavior. See id. at *4. The California court noted that the statutory definition of "diagnosed mental disorder," as incorporated in the California instructions, provides that a diagnosed mental disorder "includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." Id. at *3. The court concluded that "[t]his language clearly presumes a serious difficulty in controlling behavior: if a person cannot control his dangerous behavior to the extent that he is predisposed to commit criminal sexual acts and thus becomes a menace to others, he has sufficient volitional impairment to be found an SVP without constitutional foul." Id. at *4. The court also noted that even the United States Supreme Court has recognized "[t]he inability to control behavior cannot constitutionally `be demonstrable with mathematical precision.'" Id. (quoting Crane, 122 S.Ct. at 870, 122 S.Ct. 867).
Other appellate courts have reached the same conclusion in post-Crane decisions. See People v. Mahoney, No. GO27366, 2002 WL 682302, *10 (Cal.Ct.App. Apr.24, 2002) (concluding that the court adequately instructed the jury when it gave the standard instruction because "[e]ssentially, the jury had to make the finding required by Crane before it could reach the ultimate verdict it rendered"); People v. Dacayana, No. B134228, 2002 WL 471177, *9 (Cal.Ct. App. Mar.27, 2002) (finding that defendant's commitment satisfied the constitutional standard articulated in Crane because the instruction tracked the statutory language and "[a] person who meets these criteria necessarily has `serious difficulty in controlling behavior'"); In re Dutil, 437 Mass. 9, 768 N.E.2d 1055, 1063-64 (2002) (finding that Massachusetts statute which requires a court to find behavior indicating "a general lack of power to control ... sexual impulses" that results in a likelihood of harm to a victim because of "uncontrolled or uncontrollable desires" meets the Crane "serious difficulty"standard). But see Thomas v. State, 74 S.W.3d 789, 791-92 (Mo.2002) (concluding that instruction which required findings that the person "is more likely than not to engage in predatory acts of sexual violence if he is not confined" did not meet Crane requirement of "serious difficulty").
The instruction given in Westerheide's trial is very similar to the instruction approved by the California courts. The Westerheide instruction defined mental abnormality as a "mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses. The term volitional means the act of will or choosing or the act of deciding or the exercise of will.... [L]ikely to engage in acts of sexual violence means a person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." This instruction encompasses the California instruction, and even goes further by elaborating on the meaning of volition. *109 Under this instruction, in order for the jury to find that Westerheide met the statutory definition of an SVP, the jury had to conclude that his ability to control his dangerous behavior is impaired to such an extent that he poses a threat to others. While the instruction does not use the words "serious difficulty" in controlling behavior, it conveys this meaning. We accordingly find no constitutional infirmity in this instruction.
Westerheide also argues that the State did not make an adequate showing regarding his difficulty in controlling his dangerous behavior. If the evidence did not prove this level of impairment, Westerheide argues that he would be entitled to a new trial based on Crane. We note, however, that the Supreme Court declined to establish any bright-line rule regarding how the lack of control determination should be made because "the States retain considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment." Crane, 122 S.Ct. at 871. The Supreme Court also recognized that this difficulty in controlling behavior is not "demonstrable with mathematical precision." Id. at 870.
After reviewing the record of Westerheide's commitment proceeding, we conclude that the evidence bears out Westerheide's serious difficulty in controlling his behavior. Two psychologists testified for the State that Westerheide is a sexual sadist and has an antisocial personality disorder. These experts further testified that this combined diagnosis makes Westerheide more dangerous and more likely to engage in future violent sexual offenses as the two disorders "potentiate each other." Even Westerheide's own mental health expert testified that it is likely that Westerheide suffers from sexual sadism, that he meets all but one criteria of an antisocial personality disorder, and that he is likely to reoffend if he does not receive proper treatment. The State and the defense experts only disagreed as to where treatment should be administered. The defense expert opined that adequate treatment could be rendered during probation; the two State experts warned that Westerheide was in need of treatment in a controlled environment before being released for closely monitored outpatient care. Based on the evidence of volitional impairment presented at the commitment proceeding, we conclude that Westerheide's commitment as a sexually violent predator meets the constitutional standards of Crane.
Westerheide also contends that the "clear and convincing evidence" standard of proof specified in the Ryce Act violates due process. He argues that the State should be held to the "beyond a reasonable doubt" standard. We find no merit to this claim.
In Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the United States Supreme Court addressed the issue of what standard of proof is constitutionally required in an involuntary civil commitment. While "the preponderance standard falls short of meeting the demands of due process[,] ... the reasonable-doubt standard is not required." Id. at 431, 99 S.Ct. 1804. The Supreme Court found the reasonable-doubt standard "inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment." Id. at 432, 99 S.Ct. 1804. The middle level burden of proof of clear and convincing evidence "strikes a fair balance between the rights of the individual and the legitimate concerns of the state." Id. at 431, 99 S.Ct. 1804. The *110 Supreme Court explained that while some states have choseneither legislatively or judiciallyto adopt the criminal law standard for civil commitment proceedings, this more stringent standard of proof is not needed nor adaptable to the needs of all states. See id. at 431-32, 99 S.Ct. 1804.
This Court has also held that "the standard of proof to be applied in [a] civil commitment proceeding is `clear and convincing evidence.'" In re Beverly, 342 So.2d 481, 488 (Fla.1977). We explained that this standard of proof is appropriate in civil commitment proceedings:
While both civil commitment proceedings and criminal proceedings may result in confinement, a person involuntarily committed for mental illness is entitled to treatment, to review of his condition and to release when he is no longer in need of treatment. There is a differentiation between persons in need of mental treatment and persons who violated the criminal laws. The difficulty in proving an individual state of mind combined with a stringent reasonable doubt standard, may work a hardship on the individual who has a right to treatment and to society which has a right to protection.
Id.
Based upon Addington and In re Beverly, we conclude that the clear and convincing standard of proof in the Ryce Act does not violate either the federal or state due process guarantees.
For the reasons expressed above, we find no merit to Westerheide's due process claims and answer the third certified question in the negative.

Equal Protection
Westerheide raises the following equal protection claims: (1) the lack of set criteria for evaluating whether an individual suffers from a mental abnormality and the likelihood of recidivism results in unequal treatment of alleged predators statewide; and (2) sexually violent predators are treated differently from other individuals who are civilly committed because the Ryce Act precludes less restrictive alternatives to total confinement. Westerheide also contends that this Court should evaluate his equal protection claims under the strict scrutiny standard. In the appeal below, the district court concluded that the Ryce Act satisfies both the strict scrutiny standard and the rational basis standard. See Westerheide, 767 So.2d at 655.
"[I]f the interest which is being taken is a fundamental interest, or if the classification being challenged is based on a suspect classification (such as race), then the means or method employed by the statute to remedy the asserted problem must meet not only the rational basis test, but also the strict scrutiny test." Mitchell v. Moore, 786 So.2d 521, 527 (Fla. 2001). To withstand strict scrutiny, a law must be necessary to promote a compelling governmental interest and must be narrowly tailored to advance that interest. See State v. T.M., 761 So.2d 1140, 1144 n. 2 (Fla. 2d DCA 2000). Absent the involvement of a suspect class or a fundamental right, courts usually invoke the rational basis test, under which the law must bear some rational relationship to legitimate state purposes. See, e.g., Lite v. State, 617 So.2d 1058 (Fla.1993); Florida High School Activities Ass'n, Inc. v. Thomas, 434 So.2d 306 (Fla.1983).
Initially, we conclude that Westerheide's first equal protection claim is actually a due process claim. As the district court explained in its opinion below, the equal protection clause is only concerned with whether the classification pursuant to a particular legislative enactment is properly drawn. Procedural due process is the constitutional guarantee involved with a *111 determination of whether a specific individual is placed within a classification. See Westerheide, 767 So.2d at 653-54 (quoting Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure, § 18.1, at 206-07 (3d ed.1999)).
Westerheide claims that the allegedly vague standards for evaluating whether an individual suffers from a mental abnormality and the likelihood of recidivism will result in inconsistent findings of whether a person falls within the statutory classification of a sexually violent predator. However, a statute is not unconstitutional simply because inconsistent conclusions can be reached by applying the same statutory terminology. See L.B. v. State, 700 So.2d 370, 373 (Fla.1997). We have determined that the statutory terms "mental abnormality" and "likely to engage in acts of sexual violence" are not unconstitutionally vague under the due process clause. The possibility that experts may render inconsistent findings as to these statutory requirements also does not render the Ryce Act unconstitutional under the due process clause. See id.
Westerheide's second equal protection claim involves the Legislature's creation of the classification of sexually violent predators and the differential treatment afforded those individuals committed under the Ryce Act and those committed under the Baker Act, Florida's general civil commitment statute. Specifically, Westerheide cites to the Ryce Act's express preclusion of less restrictive alternatives to total confinement and the Baker Act's policy that the least restrictive appropriate treatment be utilized. Compare § 394.911, Fla. Stat. (2001) ("Less restrictive alternatives are not applicable to cases initiated under this part.") with § 394.459(2)(b), Fla. Stat. (2001) ("It is further the policy of the state that the least restrictive appropriate available treatment be utilized based on the individual needs and best interests of the patient and consistent with optimum improvement of the patient's condition.").
The classifications created by the Ryce Act and the Baker Act, different classes of mentally ill individuals, are not suspect classes, and, thus, not subject to strict scrutiny on this basis. In fact, even the dissenting justices in Hendricks recognized that the "Constitution does not require [a state] to write all of its civil commitment rules in a single statute or forbid it to write two separate statutes each covering somewhat different classes of committable individuals." 521 U.S. at 377, 117 S.Ct. 2072 (Breyer, J., dissenting). Westerheide also contends that his fundamental right to liberty is at issue here and, thus, strict scrutiny is the proper standard by which the statute should be measured. However, we conclude that Westerheide mischaracterizes the nature of his equal protection claim. Even though Westerheide's liberty may ultimately be at stake, his claim challenges the Legislature's decision to create a special classification for sexually violent predators and to apply special procedures to such involuntary civil commitments. Thus, we conclude that Westerheide's equal protection claim should be evaluated under the rational basis test. See Martin v. Reinstein, 987 P.2d at 795-98 (applying rational basis test to equal protection claim based on differential treatment for those committed under the sexually violent predator act and those committed under civil involuntary commitment statute); Hubbart v. Superior Court, 81 Cal.Rptr.2d 492, 969 P.2d at 604-05 (same as to claim based on different criteria for commitment of sexually violent predators and other mentally disordered persons released from prison); In re Samuelson, 189 Ill.2d 548, 244 Ill.Dec. 929, 727 N.E.2d 228, 236-37 (2000) (same as to *112 claim based on different rights afforded under Sexually Violent Persons Commitment Act and the Mental Health Code); In re Williams, 628 N.W.2d 447, 451-53 (Iowa 2001) (same as to claim that Iowa law "treats mentally ill sexual offender commitments differently than other mentally ill civil commitments").
Under the rational basis standard the party challenging the statute bears the burden of showing that the statutory classification does not bear a rational relationship to a legitimate state purpose. See Lite v. State, 617 So.2d 1058, 1060 (Fla. 1993). Further, it is not a requirement of equal protection that every statutory classification be all-inclusive. Rather, the statute must merely apply equally to the members of the statutory class and bear a reasonable relation to some legitimate state interest. See LeBlanc v. State, 382 So.2d 299, 300 (Fla.1980).
The Ryce Act serves the dual state interests of providing mental health treatment to sexually violent predators and protecting the public from these individuals. Further, the act applies equally to all members of the statutory class of "sexually violent predators." Westerheide's equal protection argument rests on the false premise that individuals subject to commitment under the Ryce Act are similarly situated to mentally ill persons committed under the Baker Act. The Legislature has clearly stated the reasons for distinguishing sexually violent predators from other mentally ill persons. Sexually violent predators "have antisocial personality features which are unamenable to existing mental illness treatment modalities" and which "render them likely to engage in criminal, sexually violent behavior." § 394.910, Fla. Stat. (2001). Further, the "treatment needs of this population are very long term" and necessitate very different treatment modalities from those appropriate for persons committed under the Baker Act. Id. By definition, a sexually violent predator "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." Id. § 394.912(10)(b) (emphasis added). Thus, only those individuals who require long-term treatment in a secure facility qualify for commitment under the Ryce Act and no less restrictive alternative is appropriate for these individuals. In contrast, involuntary commitment under the Baker Act is intended to provide "intensive short-term ... treatment" to persons with serious mental disorders and return them "to the community as soon as possible." See id. § 394.453.
We conclude that the specialized treatment needs of sexually violent predators and the high risk that they pose to the public if not committed for long-term control, care, and treatment justify the Legislature's separate classification and treatment scheme. Thus, we find no equal protection violation and answer the fourth question in the negative.

Conclusion
For the reasons stated above, we find no merit to Westerheide's constitutional challenges to the Ryce Act, answer all of the certified questions in the negative, and approve the decision below.
It is so ordered.
WELLS and LEWIS, JJ., concur.
QUINCE, J., concurs in result only with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which ANSTEAD, C.J., and SHAW, J., concur.
*113 QUINCE, concurring in result only.
If this Court were writing on a clean slate, I would vote to declare this statute, sections 394.910-.930, Florida Statutes (2000), commonly known as the Jimmy Ryce Act, unconstitutional for a variety of reasons, the most glaring of which is the due process of law violation. However, the slate is not clean. The United States Supreme Court in Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), addressed a similar statute enacted in Kansas and upheld that enactment against claims of ex post facto, double jeopardy, due process and equal protection. Because I can discern no significant difference in the two statutes, I must concur with the ultimate outcome of this case.
Despite such concurrence, I perceive some serious problems with the Jimmy Ryce Act. The most significant problem in my estimation is the fact that persons who have paid their debts to society by completion of the sentences imposed for their criminal activity now face indefinite detentions for those same crimes, all in the guise of helping society by giving the defendants treatment for their sexual deviant behavior. If our true goal is to change the behavior of the defendants so that they can be safely returned to our communities then we should begin this process in a more timely fashion.
Some of these defendants are incarcerated for years, depending on the nature and classification of the sexual crime and even other crimes they committed. It would, therefore, seem more appropriate and of greater value, even increasing the chances of treatment doing some real good, to make the determination of a defendant's status as a sexual predator at a time soon after the defendant's incarceration begins. If in fact treatment is available for the defendants, that treatment should begin while the defendants are serving their sentences instead of waiting until the defendants complete the punishment that we have imposed.
Some scheme such as this would go a long way in eliminating the due process problems that are inherent in the present Jimmy Ryce Act. For example, the statute provides for ex parte determinations of whether probable cause exists to believe that the defendants are sexual predators and thus eligible for continued confinement after the expiration of their sentences. Defendants and their attorneys are not allowed to be present. If it is determined that probable cause exists, the trial judge will order that the defendants remain in custody and then be immediately transferred to a secure facility, if their sentences have already expired. Only if the defendants are not brought to trial within thirty days after the ex parte probable cause determinations, can the defendants have an adversarial probable cause determination. However, by that time, the defendants may already be in detention for several months beyond their original release dates. And certainly during these months prior to the trial of these cases, the defendants are not receiving treatment one of the ostensible purposes of the Jimmy Ryce Act. See § 394.910, Fla. Stat.
While I agree with much of Justice Pariente's dissent, I cannot agree that the State did not demonstrate that Westerheide has serious difficulty in controlling his behavior, as that phrase has been used by the United States Supreme Court in Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002). The mental health experts testified that sexual sadism, Westerheide's diagnosis, is a chronic and progressive disease that leads to other experimentation and increases to life-threatening behavior. Indeed the experts indicated Westerheide also suffers from an antisocial personality disorder, and he has *114 problems conforming his conduct to that of others in society.
For these reasons, I reluctantly concur only in the result reached by the majority.
PARIENTE, J., concurring in part and dissenting in part.
I concur with the analysis in the majority opinion on the constitutional issues to the extent that the majority holds that, based on United States Supreme Court precedent, the Jimmy Ryce Act withstands a facial constitutional challenge. My disagreement with the majority and my specific concerns are with the jury instructions.
In my view, Westerheide is entitled to a new trial because the jury instructions did not properly instruct the jury that in order to find him a sexually violent predator, the State must prove that there is a "high likelihood" of reoffending and that Westerheide must have "serious difficulty in controlling his behavior."[20] Although the United States Supreme Court upheld statutes providing for the indefinite commitment of sexually violent predators in Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), since Hendricks the Supreme Court, in Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), has definitively narrowed the class of offenders who may be constitutionally detained after they have completed serving their criminal sentences.
To prevent civil commitment of sexual offenders from becoming a "mechanism for retribution or general deterrence," id. at 870, which are the proper functions of criminal law, the United States Supreme Court in Crane clarified:
It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.
Id. (emphasis supplied). Thus, considered in light of the nature of the psychiatric diagnosis and the severity of the mental abnormality itself, "proof of serious difficulty in controlling behavior" is the critical element that must be considered in order to distinguish those offenders who are "likely to engage in acts of sexual violence if not confined in a secure facility for long-term *115 control, care, and treatment" under the Ryce Act, from those offenders who are convicted in an ordinary criminal case.
Because it is the jury as the factfinder who must make these critical determinations, I also disagree with the majority's conclusion that the jury is not required to be explicitly instructed on the State's burden of proof regarding the standard for commitment of "serious difficulty in controlling behavior." Majority op. at 107. The jury instructions must contain clear guidance so that the jurors understand that they are deciding that the defendant is a "dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment" rather than a "dangerous but typical recidivist convicted in an ordinary criminal case." Crane, 122 S.Ct. at 870.
Thus, I agree with the line of cases that has recently emerged from the First District Court of Appeal concluding that the failure to give to the jury an instruction that it must determine that the offender has serious difficulty controlling his or her behavior constitutes reversible error. See White v. State, 826 So.2d 1043 (Fla. 1st DCA 2002) (stating that Crane required jury instruction that offender had "serious difficulty" in controlling his or her behavior); Converse v. Dep't of Children & Families, 823 So.2d 295(Fla. 1st DCA 2002) (holding that the trial court's failure to instruct the jury that they had to determine whether defendant lacked control over his sexually violent conduct violated due process); Hudson v. State, 825 So.2d 460 (Fla. 1st DCA 2002) (holding that, in light of Crane, the trial court's failure to find that the defendant had serious difficulty in controlling behavior was reversible error).[21] This is also in accord with the decision of the Washington Court of Appeals when it recently concluded that the "Crane majority ruled that lack of control is a constitutionally required element of the cause of action, and that a trier of fact must make the lack-of-control determination." Spink v. State, 112 Wash.App. 287, 48 P.3d 381, 382 (2002). Without explicit and adequate jury instructions, there is no assurance that the jury made the required findings to render an indefinite civil commitment constitutionally acceptable.
In Thomas v. State, 74 S.W.3d 789, 790 (Mo.2002), the Supreme Court of Missouri held that the following instruction did not comport with Crane:
If you find from the evidence beyond a reasonable doubt:
. . . .
Third, that the respondent suffers from a mental abnormality, and Fourth, that as a result of this abnormality the respondent is more likely than not to engage in predatory acts of sexual violence if he is not confined in a secure facility, then you will find respondent is a sexually violent predator.
(Emphasis supplied.) Notably, then, the Missouri Supreme Court held that even *116 the language of the instruction that was requested by Westerheide and denied by the trial court in the present case was insufficient to satisfy Crane. The Court reasoned:
[T]o be constitutional under Crane, the instruction must require that the "degree" to which the person cannot control his behavior is "serious difficulty". Although the instructions used below required findings that "the respondent is more likely than not to engage in predatory acts of sexual violence if he is not confined", this is not enough because they did not require the juries to "distinguish the dangerous sexual offender whose mental illness, abnormality or disorder subjects him to civil commitment from the dangerous but typical recidivist".
... To comply with Crane, the instruction defining mental abnormality must read as follows:
As used in this instruction, "mental abnormality" means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to commit sexually violent offenses in a degree that causes the individual serious difficulty in controlling his behavior.

Id. at 791-92 (footnotes omitted).
In additionand relatedlythe jury instruction fails to adequately instruct the jury as to the element of the likelihood of reoffending. In my view, to comport with the heightened requirements of Crane, it is critical to properly define "likely." The majority acknowledges that the Act encompasses only those individuals who pose a risk to society because there is a "high likelihood that they will engage in repeat acts of predatory sexual violence." Majority op. at 102 (citing § 394.910, Fla. Stat. (2001)). As to this element, the current jury instruction simply states:
[T]he term likely to engage in acts of sexual violence means a person's propensity to commit acts of sexual violence as to pose a menace to the health and safety of others.
In giving this instruction, the trial court rejected Westerheide's requested instruction defining "likely" as "more likely to happen than not," or "having a better chance of existing or occurring than not."
The majority and the Fifth District acknowledge that "likely" means "highly probable" or "probable and having a better chance of existing or occurring than not." Notwithstanding this concession, the majority concludes that Westerheide is not entitled to a specific instruction to this effect because "likely" is "commonly understood by men and women of common intelligence to mean ... having a better chance of ... occurring than not." Majority op. at 106. However, although I agree that the term is not unconstitutionally vague, I also agree with Judge Sharp's observations in her specially concurring opinion in this case:
Since the second part of the definition turns on "likely," I agree with Westerheide that this term is key and vital, and that any jury instructions given should address what it means. The majority concludes that "likely" needs no further explanation to the jury because everyone in our culture or society knows what it means. I am not sure that is true. Some people use the term to mean there is a chance something will occur, although less than 50%. The prosecutor, in a companion case to this one, argued to the jury that "likely" meant to him, if there was a 20% chance the defendant/potential confinee would commit another sexually violent act, the test was met. One dictionary definition quoted by the majority says "likely" means a greater than 50% chance something will *117 occur, and the other dictionary quoted by the majority says the probability must be a good deal more than 50%, a high probability of occurring. That is quite a range of possibilities, and one too great to pass constitutional muster, in my view, in an appropriate case.
Since this statute has very grave consequences for persons found to be sexually violent predators and since we (as courts) at least until this time in our democracy, have always sided with freedom for the individual, I would read the language of the statute as placing the highest barrier to being found to be a sexual predator. The ending part of the statutory definition of "likely to engage" says this likeliness must be "of such a degree as to pose a menace." Thus, I would construe "likely" as meaning a high probability, greater than 50%.
Westerheide v. State, 767 So.2d 637, 660 (Fla. 5th DCA 2000) (Sharp, J., concurring specially) (footnotes omitted).[22] Thus, because this term is critical to the decision whether to civilly commit an individual, the jury should have been more explicitly instructed as to the meaning of the term "likely."[23]
There is yet another related problem with the jury instructions. "[L]ikely to engage in acts of sexual violence" is presently defined in the jury instructions as meaning that "a person's propensity to commit acts of sexual violence is of such degree as to pose a menace to the health and safety of others." Westerheide, 767 So.2d at 656 (emphasis supplied). The majority concludes that based on the instruction given in Westerheide,
in order for the jury to find that Westerheide met the statutory definition of an SVP, the jury had to conclude that his ability to control his dangerous behavior is impaired to such an extent that he poses a threat to others. While the instruction does not use the words "serious difficulty" in controlling behavior, it conveys this meaning. We accordingly find no constitutional infirmity in this instruction.
Majority op. at 109 (emphasis supplied). In actuality, by instructing the jury that the term "likely to engage in acts of sexual violence means a person's propensity to *118 commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others," the jury instructions merge two entirely different analyses.
The problem with this part of the instruction is that the instructions define "likelihood" as measured by whether the person "poses a menace to the health and safety of others". By focusing on whether the person "poses a menace to the health and safety," the jury is told it should consider the consequence of reoffending. For example, a defendant may have a five percent likelihood of reoffending. However, the consequence of reoffending would be severe harm to the physical and emotional well-being of another person. Although such a defendant may therefore be "a menace to the health and safety of others" in the mind of a juror, the majority concedes that such a defendant should not be subject to civil commitment because the majority acknowledges that the Act encompasses only those individuals who "pose a risk to society because there is a high likelihood that they will engage in repeat acts of predatory sexual violence." Majority op. at 102 (emphasis added). Because of the grave constitutional consequences of civil commitment, "likely to engage in acts of sexual violence" should be defined separately. The question of likelihood should not be answered solely by the determination of whether a defendant "poses a menace to the health and safety of others."
The deficiencies in the jury instructions cannot be considered harmless error because the jury instructions failed to adequately explain the essential elements of the basis for civil commitment. Further, unlike Hendricks where Hendricks admitted to pedophilia and a lack of control, in this case Westerheide was not diagnosed to be a pedophile and did not admit a lack of control.[24] Westerheide was diagnosed as suffering from antisocial personality disorder and sexual sadism. As recently noted in Crane, it is estimated that between forty and sixty percent of the male prison population is diagnosable with antisocial personality disorder. See 122 S.Ct. at 870.
Apparently, the only reason that Westerheide was criminally charged and received criminal sanctions was because he engaged in the sexually sadistic acts with a fifteen-year-old minor. Yet there was no testimony that Westerheide posed a specific future threat to minors or children. Further, it is important to note that, unlike pedophilia, acts of sexual sadism between consenting adults are not necessarily a crime. Thus, in this case, it appears that the question under the Jimmy Ryce Act is not whether Westerheide was likely to recommit the potentially legal act of sexual sadism. Rather, the more proper question is whether, because of his mental impairment, Westerheide was likely to recommit the illegal act of either sexual sadism on a minor or statutory rape. By subjecting Westerheide to civil commitment simply because he may have been substantially likely to recommit sexual sadism, the State was utilizing the Jimmy Ryce Act to incapacitate Westerheide for behavior that is perhaps deviant, but not necessarily criminal. Therefore, the *119 fact that there was testimony that Westerheide might "reoffend" by committing acts of sexual sadism does not necessarily mean that Westerheide falls into the class of individuals allowed to be indefinitely confined under the Jimmy Ryce Act, which was designed to prevent dangerous sexual predators from recommitting criminal acts of sexual violence.
Without minimizing the nature of the initial crime for which Westerheide was convicted and for which he served his full sentence, and without denying that Westerheide may need treatment for his mental illness, the question in the present case is whether the state may constitutionally hold Westerheide in indefinite civil commitment. That question must be answered by the jury based on adequate jury instructions.
Therefore, because neither the jury instructions nor our present statute limits civil commitment to those who have "serious difficulty in controlling behavior," Crane, 122 S. Ct at 870, or to those for whom there is a "high likelihood that they will engage in repeat acts of predatory sexual violence," majority op. at 102, I would reverse for a new trial.
I also share Judge Sharp's general concern regarding the Ryce Act:
My final general concern about this statute is that it is not based on sound medical or scientific practices or findings, although Westerheide has dropped his Frye-test argument in this appeal. The Legislature made a finding, in passing this statute, that there exists a small but very dangerous group of people called "sexually violent predators." However, there is no evidence this group truly exists and is identifiable.
Even if such a "syndrome" can be established by legislative fiat, there is also great uncertainty about the accuracy of psychiatric diagnosis and the prediction of future behavior. As Justice Brennan explained in his dissenting opinion in Jones v. United States[, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983)]:

... Commentators and researchers have long acknowledged that even the best attempts to identify dangerous individuals on the basis of specified facts have been inaccurate roughly two-thirds of the time, almost always on the side of over-prediction. On a clinical basis, mental health professionals can diagnose past or present mental condition with some confidence, but strong institutional biases lead them to err when they attempt to determine an individual's dangerousness, especially when the consequence of a finding of dangerousness is that an obviously mentally ill patient will remain within their control.
It appears to me that in this case Westerheide should have been able to challenge the admissibility of the expert opinion offered against him on the ground that the experts have no scientific basis to enable them to predict future acts of violence.
Westerheide, 767 So.2d at 661 (footnote omitted) (citation omitted) (Sharp, J., concurring specially). Accordingly, on remand, Westerheide should be permitted to challenge the expert opinion offered against him.
Finally, I share Justice Quince's concerns about the serious constitutional problems with the Jimmy Ryce Act but understand, as Justice Quince does, that we are obligated to view this statute through the constitutional lens set forth by the United States Supreme Court majority in Hendricks, 521 U.S. at 346, 117 S.Ct. 2072. However, I echo the concerns of Chief Justice Zlaket in In re Leon G., 200 Ariz. 298, 26 P.3d 481 (2001), vacated sub *120 nom. Glick v. Arizona, 535 U.S. 982, 122 S.Ct. 1535, 152 L.Ed.2d 461 (2002):
My concerns with our SVP statutes, however, go beyond the issue of volitional control. If, as a matter of sound public policy, lawmakers decide that some offenders should be removed from society for longer periods of time than others, so be it. In that event, the legislature can prescribe greater criminal sentences....
If, on the other hand, these individuals need treatment, it is fair to ask why they are not aggressively treated during the considerable time they spend in prison serving their sentences. The practice of warehousing human beings for long, fixed prison terms and thereafter attempting to retain them indefinitely in custody for psychiatric treatment is at best wasteful, but arguably also offends traditional notions of justice and fair play. Moreover, it threatens to turn the law of civil commitment on its head.
Id. at 491, 122 S.Ct. 1535 (Zlaket, C.J., dissenting).
This comports with Judge Sharp's observation in her special concurrence below:
The statute uses the words "care and treatment" rather than "punishment" but it is problematic whether such treatment programs actually exist or whether the ones in place are effective to treat such mental disorders.
Westerheide, 767 So.2d at 659.
The very phrase "sexually violent predator" is enough to instill fear in our hearts. An understandable reaction when faced with the spectre of a "sexually violent predator" unrestrained in our neighborhood is to hope that our government will go to any lengths to prevent that person from harming individualsespecially childrenin the future.
Let there be no mistake: I deplore the criminal acts that Westerheide committed. However, no matter how reprehensible an individual's past criminal behavior has been, this country has prided itself on placing constitutional restrictions on the government before that individual's liberty may be completely restrained. Thus, as Chief Justice Zlaket observed:
I cannot help but wonder where this novel approach to crime, punishment and public safety will lead us. How can we be sure, as the attorney general has argued, that the legislature will continue to view only sexual offenders as a special and unique class of criminals? If prosecutors are able to find mental health professionals willing to testify that people who commit repetitive assaults of a non-sexual nature have a mental abnormality predisposing them to such violent behavior, will the legislature pass laws to keep them incarcerated beyond their criminal sentences by the device of civil commitment? How about perpetrators of multiple domestic violence? Chronic drunk drivers? Violent drug offenders? What are the limits of this "end run" around the normal criminal justice process?
In re Leon G., 26 P.3d at 491. For the sake of our democracy and the freedom that has been the hallmark of our society, let us hope that is not where we are headed.
While this Court is not at liberty to change the statute our Legislature has passed, we are charged with the constitutional obligation of ensuring that civil commitment under the Jimmy Ryce Act strictly comports with the constitutional requirements set forth by the United States Supreme Court. The dangers of failing to narrow the class of individuals who are subject to civil commitment by clearly setting forth the dual requirements *121 of serious difficulty in controlling behavior and high likelihood of reoffending are grave. At the very least, we must and should require clear, precise, and adequate jury instructions to guide the jury in this largely uncharted path of civil commitment for individuals before these individuals are labeled as sexually violent predators and thus subject to indefinite confinement. Adequate jury instructions were not given in this case. Therefore, a serious injustice will result if Westerheide is not given a new trial with proper jury instructions.
ANSTEAD, C.J., and SHAW, J., concur.
NOTES
[1] See §§ 394.910-.930, Fla. Stat. (2000). As enacted in 1998, the Ryce Act appeared in chapter 916, which is entitled "Mentally Deficient and Mentally Ill Defendants." See §§ 916.31-916.49, Fla. Stat. (Supp.1998); ch. 98-64, §§ 2-23, at 446-55, Laws of Fla. After the Ryce Act went into effect on January 1, 1999, it was transferred to chapter 394, which is entitled "Mental Health." See ch. 99-222, §§ 3-24, at 1373-87, Laws of Fla.
[2] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[3] The opinion below recounts the details of a sadistic "consensual" sexual relationship between Westerheide and a fifteen-year-old female victim. See Westerheide, 767 So.2d at 642.
[4] Westerheide claims that the expert testimony regarding the likelihood that he will reoffend failed to meet the Frye standard and should not have been admitted. However, Westerheide admits that he did not present this particular issue to either the trial court or the district court. Thus, the issue has not been preserved for review.
[5] Under section 394.912(10), Florida Statutes (2001), a sexually violent predator is defined as any person who "[h]as been convicted of a sexually violent offense" and "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment."
[6] Florida's Ryce Act is similar to the Kansas Sexually Violent Predator Act in many respects. See Kan. Stat. Ann. § 59-29a01-a20 (Supp.2001).
[7] Under the statutory definition, an individual can be "convicted of a sexually violent offense" in three ways: the person has been adjudicated guilty or delinquent after a trial, guilty plea, or plea of nolo contendere or has been adjudicated not guilty by reason of insanity. See § 394.912(2), Fla. Stat. (2001).
[8] Section 394.9155, Florida Statutes (2001), specifies the rules of procedure and evidence applicable in all civil commitment proceedings for sexually violent predators under the Ryce Act. Subsection (3) provides that the psychotherapist-patient privilege under the rules of evidence "does not exist or apply for communications relevant to an issue in proceedings to involuntarily commit a person under this part." § 394.9155(3), Fla. Stat. (2001).
[9] If an individual who is subject to involuntary civil commitment proceedings under the Ryce Act refuses to cooperate with the multidisciplinary team that is charged with recommending whether the individual meets the definition of a sexually violent predator, then the court may order the person to allow the team members to review all reports, tests, and evaluations of the person's own mental health expert or may prohibit the person's mental health expert from testifying about such items. See § 394.9155(7), Fla. Stat. (2001). A person committed under the Ryce Act must submit to a yearly mental health examination, the results of which are submitted to the court. See id. § 394.918(1). Further, an individual seeking release from such commitment must supply the court with a waiver of rights. See id. § 394.918(2).
[10] See § 394.916(3), (4), Fla. Stat. (2001).
[11] See id. § 394.916(5).
[12] See id. § 394.917(1), (3).
[13] See id. § 394.918.
[14] See id. §§ 394.918(2), 394.920.
[15] See id. § 394.918(4).
[16] To the extent that Westerheide's due process claims turn on factual disputes, such claims should have been presented to the trial court and will not be addressed for the first time on review by this Court. See Trushin v. State, 425 So.2d 1126 (Fla. 1982).
[17] In fact, eight of the justices agreed that the definition of "mental abnormality" in the Kansas act satisfies the substantive requirements of the due process clause. See Hendricks, 521 U.S. at 356, 117 S.Ct. 2072 (majority of five justices), id. at 373, 117 S.Ct. 2072 (three dissenting justices agreeing with majority regarding the due process issue).
[18] The Kansas statute defines "mental abnormality" as "`a congenital or acquired' condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." Kan. Stat. Ann. § 59-29a02(b) (Supp.2001).
[19] We address this issue as a claim of fundamental error because claims pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial or an alternate instruction requested and the issue has been raised on appeal. See, e.g., Walls v. State, 641 So.2d 381, 387 (Fla.1994). Westerheide requested and received a special instruction defining "volition" as "the act of willing or choosing, the act of deciding, exercise of will." The court denied his special instruction defining "likely" as "more likely to happen than not" or "having a better chance of existing or occurring than not." He did not ask for a special instruction as to the level of volitional impairment that must be found nor did he raise such an issue on appeal. However, failure to give an instruction necessary to prove an essential element of the crime charged is fundamental error that can be addressed even if not preserved below. Cf. Sochor v. State, 619 So.2d 285, 290 (Fla.1993) (finding that failure to give instruction on voluntary intoxication did not constitute fundamental error as voluntary intoxication was a defense to, but not an essential element of, the charged crime); see also Croft v. State, 117 Fla. 832, 835-36, 158 So. 454, 455 (1935)("[I]t is the duty of the court to instruct the jury as to each and every essential element of the offense charged, and a charge attempting to define the offense which does not cover material elements of the offense is necessarily misleading and prejudicial to the accused.").
[20] The jury instructions as given stated:

To prove ... Westerheide, is a sexually violent predator, the state must prove each of the following three elements by clear and convincing evidence.
One, ... Westerheide has been convicted of a sexually violent offense. And two, ... Westerheide suffers from a mental abnormality or personality disorder. And three, the mental abnormality or personality disorder makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term controlled care and treatment.
As to the first element, a sexually violent offense includes a lewd, lascivious or indecent assault or act upon or in the presence of a child.
With respect to the second element, the term mental abnormality means mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses. The term volitional means the act of will or choosing or the act of deciding or the exercise of will.
As to the third element, the term likely to engage in acts of sexual violence means a person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others.
Westerheide, 767 So.2d at 655-56.
[21] I disagree with the majority's statement that Westerheide failed to preserve his jury instruction argument. Majority op. at 107 n. 19. The majority concedes that Westerheide did request an instruction defining "likely" as "more likely to happen than not." Id. Further, failure to instruct the jury as to a material element of a crime is fundamental error. See McMillon v. State, 813 So.2d 56, 58 (Fla. 2002); State v. Delva, 575 So.2d 643, 644 (Fla.1991) (stating that "`[i]t is an inherent and indispensable requisite of a fair and impartial trial ... that a defendant be accorded the right to have a Court correctly and intelligently instruct the jury on the essential and material elements of the crime charged'"). Although this case involves civil commitment and not a criminal trial, the same principle should apply here because, like a criminal conviction, civil commitment results in the loss of a person's liberty. Accord Converse, 823 So.2d at 296-97.
[22] Similar to Westerheide's challenge, in People v. Superior Court, 27 Cal.4th 888, 119 Cal.Rptr.2d 1, 44 P.3d 949 (2002), the defendant argued that "likely" required proof of "more likely than not"i.e. a greater than fifty percent chance of reoffending. The California Supreme Court disagreed and held that the state's SVP statute did not require proof of a greater than fifty percent chance of reoffending. Id. at 972-73. However, Superior Court is distinguishable from this case. In this case, the majority concedes that the standard required by Florida's SVP statute is greater than a fifty percent chance of reoffending. See majority op. at 106.
[23] The Wisconsin Supreme Court recently approved a jury instruction worded similarly to the instruction advanced by Westerheide. See State v. Laxton, 254 Wis.2d 185, 647 N.W.2d 784 (2002). In Laxton, the jury was instructed that in order to find the defendant eligible for civil commitment, the jury must find that the defendant was "dangerous to others because he has a mental disorder which creates a substantial probability that he will engage in acts of sexual violence." Id. at 795. The trial judge further instructed the jury that "a substantial likelihood means much more likely than not." Id. The Wisconsin Supreme Court stated that an instruction that required proof that due to a mental disorder it is substantially probable that a person will engage in acts of sexual violence if not civilly confined satisfied Crane. See id. at 794-95. Moreover, the court explicitly stated that it was "settled law" that "substantially probable" meant "much more likely than not." Id. at 793-94. According to the court, it was specifically this requisite proof of substantial probability that distinguished a typical recidivist from a dangerous sexual offender.
[24] "Proof of serious difficulty in controlling behavior" was not at issue in Hendricks because Hendricks was diagnosed as suffering from pedophilia, which "involves what a lay person might describe as a lack of control," and Hendricks conceded that he could not "control the urge to molest children." Crane, 122 S.Ct. at 871; see also People v. Hancock, 329 Ill.App.3d 367, 264 Ill.Dec. 755, 771 N.E.2d 459 (2002) (holding that the challenged jury instruction satisfied Crane and noting that the respondent was diagnosed with the same disorder as Hendrickspedophilia, a condition that inherently satisfies the control requirement of Crane).