854 So.2d 709 (2003)
Roderick D. LEE, Appellant,
v.
STATE of Florida, Appellee.
No. 2D00-1430.
District Court of Appeal of Florida, Second District.
August 15, 2003.
*710 Elliott C. Metcalfe, Jr., Public Defender, and Christopher E. Cosden, Assistant Public Defender, Sarasota, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Jennifer R. Haymes, Assistant Attorney General, Tampa, for Appellee.
SILBERMAN, Judge.
Roderick Lee appeals from a commitment order placing him in the custody of the Department of Children and Family Services pursuant to section 394.917(2), Florida Statutes (1999). That statute is contained in part V of chapter 394, which is commonly referred to as the "Jimmy Ryce Act" (the Act). Although Lee raises numerous substantive and procedural issues, none require reversal. As a result, we affirm the commitment order.
On March 30, 1999, the State commenced involuntary civil commitment proceedings against Lee pursuant to the Act. The petition for a probable cause determination alleged that Lee had been convicted of three counts of lewd, lascivious, or indecent act or assault upon a child under sixteen years of age and that he suffers from a mental abnormality or personality disorder that makes him likely to engage *711 in acts of sexual violence if not confined to a secure facility for long-term control, care, and treatment.
Prior to trial, Lee filed a motion requesting that "certain novel and allegedly scientific evidence" derived from tests or measuring devices that had been administered to him be excluded from evidence. These tests included several instruments: the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR), the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R), the Violence Risk Appraisal Guide (VRAG), and the Sex Offense Risk Appraisal Guide (SORAG). Lee also challenged the admissibility of the Hare Psychopathy Checklist-Revised (PCL-R). Lee asserted that these instruments had not gained acceptance in the relevant scientific community and that the State could not properly use them to establish his future sexual dangerousness or his classification as a sexually violent predator.
After conducting a Frye[1] hearing, the trial court denied Lee's motion. The trial court concluded that the use of the instruments was not based on a new or novel scientific principle within the purview of Ramirez v. State, 651 So.2d 1164 (Fla. 1995), and that the instruments had sufficient general scientific acceptance among experts who deal with sexually violent or dangerous individuals to satisfy the State's burden of proof. The trial court denied Lee's other objections, finding that they went to the weight of the evidence and not to its admissibility.
Lee also filed numerous motions attacking the constitutionality of the Act and seeking to exclude or limit the admission of certain evidence at the commitment trial. These motions were denied.
During the trial, the State presented evidence that Lee was at a very high risk of reoffending without secure residential treatment, that residential treatment was required, and that Lee suffered from a mental abnormality. In formulating their opinions, the State's experts reviewed records relating to Lee's prior offenses and interviewed Lee. The experts testified that Lee had repeatedly approached young boys and fondled their genitals, masturbating some of the victims. They described Lee's attraction to and molestation of boys and the significance of his prior offenses in predicting sexual reoffense. They stated that Lee's history was indicative of a very powerful urge to engage in the described behavior, and Lee was a high risk to repeat the behavior in the future. The State's and Lee's experts agreed that a person's prior sexual offenses and history are the single biggest or the best predictor of the person's future behavior, although one of Lee's experts stated that there are no highly accurate predictors.
While Lee denied any attraction to children, there was evidence that he harbored cognitive distortions about his conduct and characterized himself as a protector of children. The evidence also showed that he derived pleasure or satisfaction from committing sexual acts on children, and according to expert testimony, his distorted beliefs allowed him to engage in deviant behavior.
One expert diagnosed Lee as suffering from pedophilia and a personality disorder with antisocial and possibly paranoid features that placed him at a very high risk to commit future acts of sexual violence without secure residential treatment. The expert opined that Lee's severe cognitive distortions were a serious risk factor but that Lee was treatable and residential treatment was necessary.
*712 Another expert diagnosed a sexual disorder and pedophilic tendencies, although the expert stated that he could not definitively diagnose Lee with pedophilia. The expert concluded that Lee had very poor impulse control, poor judgment, and strong deviant characteristics. He reiterated that Lee had difficulty controlling his inappropriate behavior and was a high probability risk for sexual recidivism. The expert testified that Lee believed he did not need treatment, and even if it were offered on an outpatient basis, he would not participate because he did not see himself as having a sexual disorder. A defense expert acknowledged that Lee had a high likelihood for reoffending due to his multiple sex offenses, his denial of responsibility, and his refusal of treatment.
The jury unanimously found that Lee was a sexually violent predator in need of commitment. On that basis, the trial court entered the commitment order.
In this appeal, Lee first challenges the trial court's admission of the State's scientific evidence, arguing that the evidence was unreliable and untested. When expert opinion testimony involves new or novel scientific principles, the trial court must use a four-step process to determine whether the testimony is admissible. Ramirez, 651 So.2d at 1166. The trial court must determine the following: (1) whether the expert testimony will assist the jury in understanding the evidence or in determining a fact that is at issue; (2) whether the expert's testimony is based on a scientific principle or discovery that has gained general acceptance in the particular field in which it belongs; and (3) whether the witness is qualified as an expert to present opinion testimony on the subject at issue. Id. at 1166-67. If the first three steps are satisfied, then as the fourth step the trial court may allow the expert to render an opinion on the subject of his or her expertise, and the jury is then able to determine the expert's credibility and accept or reject the testimony. Id. at 1167.
As the proponent of the evidence, the State bears the burden of establishing the general acceptance of the underlying scientific principle and the testing procedures that were used to apply that principle to the facts of the case. Id. at 1168. The question of general acceptance must be established by a preponderance of the evidence. Id. Reliability of the evidence is fundamental to the issues involved in the question of admissibility. Hadden v. State, 690 So.2d 573, 578 (Fla.1997). Evidence that is "based on a novel scientific theory is inherently unreliable and inadmissible in a legal proceeding in Florida unless the theory has been adequately tested and accepted by the relevant scientific community." Ramirez v. State, 810 So.2d 836, 843 (Fla.2001).
Although there were conflicts in the evidence as to the reliability of the tests and the conclusions drawn by the experts, we conclude that the trial court did not err by allowing the test results to be presented to the jury as part of the experts' testimony. See Jackson v. State, 833 So.2d 243, 246 (Fla. 4th DCA 2002) (upholding the trial court's determination that the actuarial instruments "are generally accepted in the relevant scientific community as part of the overall risk assessment for sexual predators"). However, even if there were any error regarding the Frye analysis and the admissibility of actuarial evidence, a harmless error analysis must be undertaken. See Green v. State, 826 So.2d 351, 353 (Fla. 2d DCA 2002).
The expert witnesses discussed their clinical evaluations of Lee, the results of tests that were administered to him, and the basis for their conclusions and recommendations. While they differed in their *713 views of the value of the test results, they acknowledged that the results were useful as one part of the evaluation process and to verify the conclusions that were reached. The record contains substantial evidence, apart from the test results, supporting the State's claim that Lee met the requirements for commitment under the Act. We are satisfied that even if there were any error in the admission of the test results, the error would be harmless. See In re Commitment of Williams, 841 So.2d 531 (Fla. 2d DCA 2003) (determining that any error in the admission of the results of risk assessment instruments was harmless).
Lee next argues that the trial court erred in admitting unreliable hearsay evidence pursuant to section 394.9155(5), Florida Statutes (1999). That statute allows the admission of hearsay in civil commitment proceedings unless the trial court finds that the evidence is not reliable, and it prohibits the use of hearsay as the sole basis for commitment. Lee also challenges the constitutionality of section 394.9155(5) on due process, equal protection, and separation of powers grounds.
The State responds that the hearsay evidence discussed by the experts was admissible pursuant to the statute; the expert's opinions were not being used as conduits for otherwise inadmissible evidence; and in accordance with the requirement of section 394.9155(5), hearsay evidence was not the sole basis for Lee's commitment. The State also notes that experts are permitted to base their opinions or inferences on facts or data that may not be admissible into evidence, if the facts or data are of a type reasonably relied upon by experts in the subject to support their opinions. See § 90.704, Fla. Stat. (1999); Riggins v. Mariner Boat Works, Inc., 545 So.2d 430, 431-32 (Fla. 2d DCA 1989); Bender v. State, 472 So.2d 1370, 1371 (Fla. 3d DCA 1985).
The record reflects that the trial court carefully analyzed the hearsay evidence that the State offered pursuant to section 394.9155(5). The court considered Lee's objections and challenges, and it excluded unreliable hearsay and hearsay that was irrelevant to the proceeding. The record also reflects that Lee did not dispute the accuracy or reliability of much of the hearsay evidence that was presented and that hearsay was not the sole basis of the commitment.
Although no Florida case directly addresses the constitutionality of section 394.9155(5), in People v. Otto, 26 Cal.4th 200, 109 Cal.Rptr.2d 327, 26 P.3d 1061 (2001), the California Supreme Court considered arguments against a similar statute that permitted the use of hearsay in sexually violent predator commitment proceedings in California. The court noted that a defendant in a civil commitment proceeding is entitled to due process protections because the proceeding involves a significant deprivation of liberty. Id., 109 Cal.Rptr.2d 327, 26 P.3d at 1067. However, after analyzing the constitutional issues that were implicated by the California statute, the court concluded that the statute met constitutional requirements.
While Lee argues generally against the constitutionality of section 394.9155(5), he points to no authority that applies in the context of a civil commitment proceeding to support his conclusion. For the same reasons expressed in Otto, we conclude that Lee has not demonstrated the existence of any constitutional infirmity arising from section 394.9155(5); the protections afforded by the statute and the role of the trial court to exclude unreliable hearsay evidence suffice to meet constitutional requirements.[2]
*714 Apart from the constitutional issues, Lee argues that the experts should not have been allowed to testify regarding factual details relating to his prior offenses that were contained in documents that the experts had reviewed. He also argues that the trial court erred in allowing the State to refer to his prior offenses during its opening statement and closing argument. Relying on Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997), and Brown v. State, 719 So.2d 882 (Fla.1998), Lee asserts that the trial court should have excluded evidence of his prior sexual offenses in exchange for his offer to stipulate to those convictions as establishing one of the elements required for commitment under the Act. The State counters that the experts necessarily had to consider certain details of Lee's prior offenses in formulating their opinions and that the evidence was specifically relevant to and probative of the issues involved in the commitment proceeding. The experts confirmed that the information was relevant and necessary in order to formulate their opinions and that Lee's past history was the best predictor of his future conduct.
There was no finding by the trial court, and there is little in the record to support Lee's argument, that the information utilized by the experts was unreliable. The evidence was admissible under section 394.9155(5), and it was of the type appropriately used by experts in formulating their opinions in commitment cases. Also, there was ample nonhearsay evidence presented to support the commitment. See Williams, 841 So.2d at 532; People v. Otto, 26 Cal.4th 200, 109 Cal.Rptr.2d 327, 26 P.3d 1061.
Courts in other states have held that evidence as to prior offenses is properly presented at a commitment proceeding because the evidence is directly relevant to and highly probative of the issues that are involved, and any prejudice does not outweigh the probative value of the evidence. See In re Detention of Turay, 139 Wash.2d 379, 986 P.2d 790, 801-02 (1999); see also In re Detention of Williams, 628 N.W.2d 447, 457 (Iowa 2001); In re Hay, 263 Kan. 822, 953 P.2d 666, 677-78 (1998). Additionally, the cases cited by Lee, Old Chief and Brown, involved criminal prosecutions rather than civil commitment proceedings and are not controlling here. Indeed, in Westerheide v. State, 831 So.2d 93, 100 (Fla.2002), the Florida Supreme Court reiterated that proceedings under the Act are civil in nature. The proceedings are designed to address the risk that sexually violent predators pose to society and to provide for the long-term care and treatment for such individuals. Id. We conclude, based on the nature of commitment proceedings and the manner in which the evidence was addressed at trial, that Lee has not shown any reversible error.
Lee next argues that the Act is unconstitutional on multiple substantive due process, ex post facto, double jeopardy, and equal protection grounds. The Florida Supreme *715 Court considered and rejected these arguments in Westerheide.
Lee's final argument is that the trial court erred because its instructions to the jury did not require a finding that Lee had a serious difficulty in controlling his behavior.[3] The trial court instructed the jury, in pertinent part, as follows:
To prove that [Lee] should be confined in a secure facility for long-term control, care, and treatment, the State must prove each of the following three elements by clear and convincing evidence:
a. Roderick D. Lee has been convicted of a sexually violent offense. [Lee] has offered to stipulate that he has been convicted of a qualifying prior offense; the Court now instructs you that he has committed such an offense; and
b. Roderick D. Lee suffers from a mental abnormality or personality disorder; and
c. The mental abnormality or personality disorder makes Roderick D. Lee likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment.
"Mental abnormality" means a mental condition affecting a person's emotional or volitional capacity which pre-disposes the person to commit sexually violent offenses.
"Likely to engage in acts of sexual violence" means a person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others.
Lee did not object to these instructions, and they were similar to the instructions that were given and approved in Westerheide.[4]See 831 So.2d at 107-09; see also Hale v. State, 834 So.2d 254, 255 (Fla. 2d DCA 2002) (relying on Westerheide to conclude that a nearly identical instruction was sufficient).
In Westerheide, the Florida Supreme Court upheld a decision of the Fifth District Court of Appeal and rejected various constitutional challenges to the Act. While four justices joined in the result, only three joined in the opinion. Regarding the adequacy of the jury instructions that were given, Senior Justice Harding, joined by Justices Wells and Lewis, concluded that the instructions were sufficient. 831 So.2d at 107-09. Justice Quince concurred in result only and expressed concerns as to the constitutionality of the Act. Id. at 113. She stated that she agreed with much of Justice Pariente's dissent, but she did not specifically discuss the jury instruction issue. Id.
Justice Pariente, joined by Justices Anstead and Shaw, concurred in part and *716 dissented in part with the court's decision. Justice Pariente wrote, "My disagreement with the majority and my specific concerns are with the jury instructions." Id. at 114. She concluded that "the jury instructions did not properly instruct the jury that in order to find him a sexually violent predator, the State must prove that there is a `high likelihood' of reoffending and that Westerheide must have `serious difficulty in controlling his behavior.'" Id.
We are mindful that "[u]nder the Florida Constitution, both a binding decision and a binding precedential opinion are created to the extent that at least four members of the Court have joined in an opinion and decision." Santos v. State, 629 So.2d 838, 840 (Fla.1994) (footnotes omitted). In Westerheide, while four justices agreed to affirm the district court, only three justices agreed to the opinion. As a result, it appears, or at least it is arguable, that Westerheide does not resolve with finality the question of the sufficiency of the jury instructions. See Kogan & Waters, The Operation & Jurisdiction of The Florida Supreme Court, 18 Nova L.Rev. 1151, 1175 (1994) (stating that a "concurring in result only opinion" can constitute the fourth vote needed for a decision but the result is that there is no precedent beyond the specific facts of that case).
Because Westerheide upheld the commitment and rejected the challenge to the jury instructions, and because Lee did not preserve any error regarding the instructions, we affirm. However, in light of (1) the division of the supreme court in Westerheide as to the sufficiency of the jury instructions, (2) the significance of this issue and its potential impact in numerous cases arising under the Act, and (3) the fact that liberty interests are at stake in commitment proceedings, we certify the following question to the Florida Supreme Court as one of great public importance:
MAY AN INDIVIDUAL BE COMMITTED UNDER THE JIMMY RYCE ACT IN THE ABSENCE OF A JURY INSTRUCTION THAT THE STATE MUST PROVE THAT THE INDIVIDUAL HAS SERIOUS DIFFICULTY IN CONTROLLING HIS OR HER DANGEROUS BEHAVIOR?
We have considered Lee's other arguments and conclude that he has not demonstrated any basis for reversal. Accordingly, we affirm the commitment order.
Affirmed; question certified.
STRINGER, J., Concurs.
CASANUEVA, J., Concurs with opinion.
CASANUEVA, Judge, Concurring specially.
I concur with the majority opinion. I write to discuss matters that are likely to be presented in future Jimmy Ryce Act cases, specifically, the character of evidence generally presented to assess whether a detainee poses a risk of future sexual violence and the need for a jury finding on the extent of the detainee's volitional ability to control his or her behavior.
Before civil commitment may be ordered, the Ryce Act requires a unanimous jury verdict finding that the detainee meets the statutory definition of a sexual predator. § 394.917(1), Fla. Stat. (2001). One element of this civil commitment statute that must be proven is that the detainee is likely to commit future acts of sexual violence. § 394.912(10)(b), Fla. Stat. (2001). This determination examines the detainee's volitional ability to control his behavior or mental abnormality. To prove these elements, the State generally offers a mental health expert's clinical opinion, buttressed by the use of actuarial instruments.
*717 Here, experts testified at trial about the likelihood that Mr. Lee would commit a future act of sexual violence based upon findings attained with certain prediction instruments: the Rapid Risk Assessment for Sex Offender Recidivism (RRASOR), the Minnesota Sex Offender Screening Tool (MnSOST-R), the Violence Risk Appraisal Guide (VRAG), and the Sex Offense Appraisal Guide (SORAG). These tools are used to predict whether the detainee possesses volitional control over his or her behavior or whether the detainee lacks that control and is likely to commit another act of sexual violence. Use of this type of testimony can raise a number of legal concerns: Are the tools an accurate predictor of the likelihood of future conduct? Do the tools measure the detainee's personal likelihood or do they measure the detainee's traits against statistics garnered from the conduct of others?
Generally, these assessments may be classified as actuarial instruments, that is, a form of statistical analysis. The assessment seeks to predict the probability that the detainee/offender will commit a new violation within a specified period of time upon being returned to the community by comparing the detainee's risk factors to similar risk factors of other offenders. Because these actuarial instruments are less than perfect in terms of sensitivity (percentage of true positives) and specificity (percentage of true negatives), most professionals involved in the area recommend the use of multiple actuarial tests.[5]
Initially known as the Statistical Risk Appraisal Guide, VRAG is an actuarial instrument used to predict violent recidivism by examining selected variables that are weighted and computed, rendering a numerical score for the individual. The individual's total score is then compared to tabulated scores of others, yielding a probability between zero and 100 percent. Among the twelve variable factors used in VRAG assessment are age, marital status, criminal history, and details of the index offense. The tool is used only on adult males. Past studies suggest that VRAG is a good predictor of general violence, but it has not been as effective at predicting sexual offense recidivism.[6]
SORAG is an actuarial instrument that uses fourteen personal characteristics or variables, including prior violent history and deviant sexual preferences. Its probability scores seek to predict the risk of violent sexual assaults in the seven to ten years following an individual's release into a community.[7]
RRASOR consists of only four components: the number of prior sexual offenses, the offender's age at release, the gender of the victim, and the offender's relationship to the victim. As the variables of RRASOR are static, they cannot be used to measure change.[8] One author has characterized its predictive accuracy as *718 "none too impressive."[9] Finally, the MnSOST-R evaluates sixteen factors and generally has a higher predictive accuracy than RRASOR. Both RRASOR and MnSOT-R are entirely actuarial devices. Scores or probability rates are derived solely from available archival data.[10]
The literature reflects that clinicians and other professionals in this field are currently debating many issues, including whether the actuarial approaches are superior to the clinical judgment of psychiatrists or psychologists, and, if so, why clinicians are employed to conduct the actuarial tests. Recent studies suggest that actuarial approaches, which use explicit, formal procedures for translating ratings on a limited number of risk factors into an overall risk score, are generally more accurate than clinical judgment.[11] Unfortunately, the existing actuarial tools do not seem to address all relevant static risk factors. "Given the current knowledge, sexual predator laws will lead to some individuals being detained who would not offend, and a number of individuals will be released who will reoffend."[12] Because prediction is never expected to be exact, efforts are being undertaken to improve diagnostic performance.[13]
Recently, a new actuarial method for violence risk assessment has become available. The Iterative Classification Tree (ICT) restricts the risk factors used to generate the actuarial tool to factors commonly available in hospital records or capable of being routinely assessed in clinical practice. The classification tree permits many different combinations of risk factors to be utilized in classifying a person as a high or low risk for violence to others. The ICT has a high degree of accuracy but can be time- and resource-intensive to administer.[14]
Understanding the actuarial evidence will fall to the collective mind of the jury.[15] In determining whether the government has met its statutory duty of establishing that the detainee poses a risk of recidivism sufficient to require his or her detention for an indefinite period of time to insure against the possibility of reoffending, the jury must rely upon the neutral instructions given by the trial court. In Kansas v. Crane, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), the Supreme Court *719 held that the state is not required to prove that a detainee lacks complete or total control in order to prove the volitional requirement, the ability of the detainee to control his or her behavior. Rather, proof of a mental abnormality or personality disorder that makes it difficult to control one's behavior is sufficient. However, the Supreme Court indicated that the Constitution mandates that the trial court must make a determination on lack of control. Under Florida law this must be made by the trier of fact; under the Ryce Act that determination will be made most often by a jury.
In Westerheide v. State, 831 So.2d 93, 107 (Fla.2002), a plurality of the court did not interpret Crane to require a specific jury instruction on the volitional impairment issue as a matter of constitutional significance. Justice Quince concurred in result only and focused, in part, on the sufficiency of the State's proof of Mr. Westerheide's inability to control his sexually violent behavior, but her concurrence did not reveal her thoughts on the jury instruction issue. However, Justice Pariente, joined by Justices Anstead and Shaw, expressed her disagreement with the plurality's conclusion that "the jury is not required to be explicitly instructed on the State's burden of proof regarding the standard for commitment of `serious difficulty in controlling behavior.'" Id. at 115 (Pariente, J., concurring in part and dissenting in part). Failure to so instruct the jury, in Justice Pariente's view, constitutes reversible error. Id. Justice Pariente also expressed her approval of a line of cases from the First District Court of Appeal reaching the same conclusion on the importance of instructing the jury that it is required to determine whether the offender has serious difficulty in controlling his or her behavior. See White v. State, 826 So.2d 1043 (Fla. 1st DCA 2002); Hudson v. State, 825 So.2d 460 (Fla. 1st DCA 2002).
Because the evidence in these cases will often consist of clinical opinions based in large part on actuarial probabilities coupled with a clinical evaluation, I would respectfully suggest that a standard jury instruction consistent with Crane should be generated and used in future jury trials. Like Judge Webster in Hudson, 825 So.2d at 460, I interpret Crane as establishing a fourth element to the Ryce Act cause of actionan element requiring not only proof from the State but also jury evaluation and finding. Without a proper instruction, the likelihood that the jury will make a constitutionally required finding on volition will be diminished or impaired. See McQueen v. State, 848 So.2d 1220, 1221 (Fla. 1st DCA 2003) (Browning, J., concurring in part and dissenting in part) (expressing the belief that "confusion prevails within the legal community concerning appropriate jury instructions, a situation that creates consequences that hinder the proper administration of justice").
In the event that the supreme court holds that a jury instruction is not mandated, I would suggest the alternative of requiring the jury to make a finding on the verdict form that the detainee has serious difficulty in controlling his or her behavior. Such a finding might satisfy the constitutional concerns raised in Crane. Because a Ryce Act case places an individual's personal freedom and liberty at risk for an indefinite term, albeit for the protection of the public rather than as punishment for a criminal offense, both the Constitution and logic mandate that the courts must ensure that the jury or factfinder specifically addresses this essential element of lack of volitional control.
NOTES
[1] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[2] We also note that hearsay evidence is permitted in other proceedings in Florida in which life or liberty are at stake, such as the sentencing phase in death penalty cases and probation revocation proceedings. See, e.g., Zack v. State, 753 So.2d 9, 23 (Fla.2000) (noting that pursuant to section 921.141(1), Florida Statutes (1995), in a capital felony case hearsay evidence was admissible in the penalty phase provided that the defendant had a fair opportunity to rebut the evidence); Gammon v. State, 778 So.2d 390, 392 (Fla. 2d DCA 2001) (reiterating that probation cannot be revoked solely on hearsay evidence that would be inadmissible in a criminal trial, but it can be revoked based on that type of evidence together with evidence that is admissible as an exception to the hearsay rule).
[3] Apart from the question of the adequacy of the jury instructions, the record contains sufficient evidence to establish that Lee either could not control his behavior or had serious difficulty in controlling his behavior. See Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002); Westerheide, 831 So.2d at 109.
[4] The record reflects that the jury was given a written copy of these instructions to refer to during its deliberations. However, when the trial court orally gave the definition of "mental abnormality," the trial transcript does not include the words "or volitional." This may have been a transcription error by the court reporter since neither party objected to the instruction read by the trial court and neither argues this point on appeal. Because the jury had before it the written instructions and there were no objections to the instructions, we decline to consider this issue for the first time on appeal. See Fla. R.Crim. P. 3.390(d); Ashley v. State, 265 So.2d 685, 694 (Fla.1972); Turner v. State, 212 So.2d 801, 803-04 (Fla. 2d DCA 1968).
[5] See Pacific Institute for the Study of Conflict and Aggression, Violence Prediction and Risk Analysis: Empirically Based Violence Prediction Systems, at http://www.violence prediction.com/methods.html. (last visited July 15, 2003).
[6] R. Karl Hanson, What Do We Know About Sex Offender Risk Assessment? Psychol. Pub. Pol'y & L., Mar./June 1998, at 50, 63.
[7] Pacific Institute for the Study of Conflict and Aggression.
[8] Hanson, at 51 ("Static risk factors, such as a history of childhood maladjustment or prior offenses, can indicate deviant developmental trajectories and, as such, mark long-term propensities to engage in criminal behavior. Static factors, however, cannot determine when offenses will occur, nor can they determine whether offenders have substantially reduced their likelihood of reoffending....").
[9] Eric Drogin, In Search of Psychology: A Jurisprudent Therapy Perspective on Sexual Offender Risk Assessment, The Advocate, March 2000, at 17, available at http://dpa.state.ky.us/library/advocate/mar00/psychol.html (last visited July 15, 2003).
[10] Id.
[11] Id.; see also Bruce J. Winick, Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis, Psychol., Pub. Pol'y, & L., Mar./June 1998, at 505, 559.
[12] Judith V. Becker & William D. Murphy, What We Know and Do Not Know About Assessing and Treating Sex Offenders, Psychol., Pub. Pol'y, & L., Mar./June, 1998, at 116, 127.
[13] John A. Swets, Robyn M. Dawes, & John Monahan, Psychological Science Can Improve Diagnostic Decisions, Psychol. Sci. in the Pub. Int., May 2000, at 1, 1.
[14] John Monahan, Henry J. Steadman, Paul S. Applebaum, Pamela C. Robbins, Edward F. Mulvey, Eric Silver, Loren H. Roth, & Thomas Grisso, Developing a Clinically Useful Actuarial Tool for Assessing Violence Risk, Brit. J. of Psychiatry, 2000, at 312.
[15] For those who litigate or preside in this field I would recommend the articles published in Psychol., Pub. Pol'y, & L., Mar./June, 1998. This volume was published by the American Psychological Association. I would like to thank Professor John Monahan, University of Virginia, School of Law, who brought this volume to my attention several years ago.